# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

SHIRLEY CLAYTON,

        Plaintiff,

vs.                                        No. CIV 07-0680 JB/LAM

PIONEER BANK,

        Defendant.

## <u>FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER</u>

**THIS MATTER** comes before the Court on Plaintiff's Requested Findings of Fact and Conclusions of Law, filed September 12, 2008 (Doc. 61), and Defendant's Proposed Findings of Fact and Conclusions of Law, filed September 12, 2008 (Doc. 59). The Court held a bench trial on August 25-26, 2008. The primary issues are: (i) whether Plaintiff Shirley Clayton proved that Defendant Pioneer Bank discriminated against her and terminated her employment because of her disability; (ii) whether Pioneer Bank had a legitimate, nondiscriminatory reason for terminating her employment; (iii) whether Clayton demonstrated that the presumptively valid reason for which Pioneer Bank terminated her, <u>i.e.</u>, that she was not attending work the hours Pioneer Bank asserted were essential to the job function, was pretext for a discriminatory reason for firing her; (iv) whether Clayton could have continued to work if Pioneer Bank provided a reasonable accommodation; (v) whether the accommodation she implicitly requested – to stay on leave until released to work by her physician, and then return on a modified schedule as allowed – would create an unreasonable hardship and undue burden on Pioneer Bank; and (vi) whether Pioneer Bank failed to accomodate Clayton, as required under the New Mexico Human Rights Act, NMSA 1978 §§ 28-1-1 to 28-1-15.

("NMHRA").  The Court finds: (i) that Clayton was a person with a disability; (ii) that she could have performed all the essential functions of her job at Pioneer Bank with a reasonable accommodation; (iii) that Pioneer Bank fired Clayton because of her disability; (iv) that, while Pioneer Bank offered a non-discriminatory reason for terminating Clayton, the reason was pretextual; (v) that, regarding Clayton's claim under the NMHRA, Pioneer Bank failed to accommodate Clayton's serious medical condition, and that an accommodation would not have been unreasonable or an undue hardship; and (vi) that Clayton is entitled to $49,310.00, which includes $29,750 for back pay and lost benefits to date,  $7,560.00 for front pay and lost benefits to be paid in the future, emotional distress damages of $4000.00, and medical expenses of $8000.00.

## PROCEDURAL HISTORY

Clayton brings claims for  employment discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12201-12213 ("ADA") and the NMHRA.  See  First Amended Complaint for Employment Discrimination in Violation of the Americans with Disabilities Act and New Mexico Human Rights Act ¶¶ 16-29, at 3-5, filed July 30, 2007 (Doc. 3)("Complaint").  The New Mexico Human Rights Commission issued its determination on Clayton's claims on May 18, 2007.  See id. ¶ 15, at 3. On July 17, 2007, the United States Equal Employment Opportunity Commission issued its dismissal and notice of right to sue with respect to Clayton's claims under the ADA.  See id.

Both parties filed motions for summary judgment.  The Court denied Defendant Pioneer Bank's motion.  See Amended Memorandum Opinion and Order at 1, filed August 12, 2008 (Doc. No. 48)("Amended Memorandum Opinion and Order").   The Court granted Clayton's motion in part and denied it in part, and held that she was entitled to summary judgment on Pioneer Bank's defense of undue burden or hardship.  See Memorandum Opinion and Order at 1, filed August 12,

2008 (Doc. 46)("Memorandum Opinion and Order").  Otherwise , the Court found that summary judgment was inappropriate.  See Amended Memorandum Opinion and Order at 1;  Memorandum Opinion and Order at 1.

The Court held a bench trial on August 25-26, 2008.  The parties concluded their presentations of evidence on August 26, 2008.  See Clerk's Minutes at 5, filed September 5, 2008 (Doc. 57).  After hearing witness testimony and considering all of the evidence presented in this matter, the Court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1.      Clayton began working for Pioneer Bank in Roswell, New Mexico, in May of 1998. See Transcript of Trial at 7:19-8:6 (Clayton)(taken August 25, 2008)("Aug. 25, 2008 Tr.").[1]

2.      In November, 2005, Clayton was working in Pioneer Bank's check-processing department with two other employees whom she supervised.  See Aug. 25 Tr. at 32:18-33:6 (Clayton).

3.      In her years of service working for Pioneer Bank, Clayton was an exemplary employee.  See Aug. 25 Tr. at 78:17-23 (Armendariz).

4.      Clayton rarely used any sick or personal leave.  See Aug. 25 Tr. at 9:17-21 (Clayton).

5.      Before her heart attack, Clayton performed all the regular duties of her position and all additional duties asked of her.  See Aug. 25 Tr. at 102:11-14 (Armendariz).

6.      Before her heart attack, Clayton had been working a modified schedule of thirty-two hours per week.  See Aug. 25 Tr. at 10:3-8 (Clayton).

7.      On November 25, 2005, Clayton suffered a heart attack.  See Aug. 25 Tr. at 12:20-22

---

[1] The Court's citations to the transcript of the trial refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

(Clayton).

8.     Upon turning sixty-two, Clayton applied for Social Security benefits, which limited her work to thirty-two hours so that she did not earn over the $12,000.00 annual allowed amount and could receive her maximum social security benefit.  See Aug. 25 Tr. at 10:3-8 (Clayton).

9.     Clayton was sixty-two years-old when she suffered her heart attack.  See Aug. 25 Tr. at 22:13 (Clayton).[2]

10.     In November of 2005, at the time of her heart attack, Clayton was earning $8.06 per hour, working thirty-two hours per week, plus occasional overtime, or approximately $14,000.00 per year.  See Aug. 25 Tr. at 10:1-8 (Clayton).

11.     In November of 2005, Clayton was contributing $800.00 per year to her 401k retirement plan, to which Pioneer Bank made a matching contribution.  See Aug. 25 Tr. at 11:18-22 (Clayton).

12.     In November, 2005, Clayton had a life insurance policy which paid $14,000.00 in benefits.  See Aug. 25 Tr. at 12:12-19 (Clayton).

13.     In November, 2005, Pioneer Bank contributed $281.59 per month towards Clayton's health insurance.  See Plaintiff's Exhibit 10, Shirley Clayton's Compensation Record 1/13/05-8/30/06 ("Compensation Record").

14.     In 2005, Clayton received an annual bonus of $245.38.  See Compensation Record.

15.     Clayton received approximately $900.00 in 2006 for vacation and holiday pay.  See Compensation Record.

---

[2] Clayton testified that she turned sixty-five in March, 2008.  See Aug. 25 Tr. at 22:13 (Clayton).  Given that her heart-attack occurred in November, 2005, she would have been sixty-two years-old at the time.

16.     Clayton was transferred to Albuquerque, where she underwent triple-bypass heart surgery in December of 2005.  See Aug. 25 Tr. at 36:6-8 (Clayton).

17.     Clayton was hospitalized for approximately two weeks before she returned to Roswell, where she underwent physical therapy for an additional two weeks.  See Aug. 25 Tr. at 12:25-13:6 (Clayton).

18.     After Clayton's heart attack, Pioneer Bank's Human Resource Manager, Laura Smith, was the person responsible for administering Clayton's leave and benefits.  See Aug. 25 Tr. at 15:25-16:6 (Clayton).

19.     At the time of the trial, Smith had changed her name to Laura McCampbell.  See Aug. 25 Tr. at 113:13-22 (Smith).

20.     Smith was responsible for communicating with Clayton regarding her status and ability to return to work.  See Aug. 25 Tr. at 16:1-6 (Clayton);  id. at 116:23-117:4 (Smith).

21.     Clayton and Smith communicated on a regular basis after Clayton returned to Roswell.  See Aug. 25 Tr. at 16:7-14 (Clayton); id. at 118:11-19 (Smith).

22.     On November 29, 2005, Smith sent Clayton a letter notifying her that she had been placed on leave under the Family Medical Leave Act ("FMLA") for up to twelve weeks.  See Plaintiff's Exhibit No. 3, Letter from Laura Smith to Shirley Clayton, dated November 29, 2005 ("We have placed you on leave under the Family Medical Leave Act (FMLA) effective 11/28/2005."); see Plaintiff's Exhibit No. 11, Affidavit of Christopher Palmer ¶ 8, at 11 (executed November 16, 2006)("Palmer Affidavit").

23.     Upon her return to Roswell, Clayton's physician, Dr. Audrey Vega, placed Clayton under medical restrictions, which prevented her from returning to work.  See Aug. 25 Tr. at 13:18-14:1 (Clayton).

24.     At Smith's request, Dr. Vega completed and returned a Physician's Certification indicating that Clayton had a  "serious health condition" and was anticipated not to return to work for four months because of her surgery.  Plaintiff's Exhibit No. 5, Family and Medical Leave Certification (completed by Dr. Vega, January 4, 2006)(listing the "anticipated return to work date" as "4 months").

25.     In January, 2006, Clayton was hospitalized for three days because she was experiencing problems controlling her blood pressure.  See Aug. 25 Tr. at 36:15-17 (Clayton).

26.     On February 22, 2006, at Smith's request, Dr. Vega completed a Physician's Certification stating that Clayton would be "incapacitated for 6 months or more" and that she would need "6-months off."  Plaintiff's Exhibit No. 6, U.S. Department of Labor Certification of Health Care Provider at 1 (completed by Dr. Vega, February 22, 2006)("Certificate of Health Care Provider").

27.     Specifically, Dr. Vega certified that Clayton would not be able to work a full schedule for six months, that she was incapacitated, and that she would be unable to work, attend school, or perform other regular daily activities for six months or more.  See Certificate of Health Care Provider at 1-2.

28.     Dr. Vega certified that Clayton was "unable to work" and "incapacitated" from November 2005 until August of 2006.  See Certification of Health Care Provider at 1, 4.

29.     After providing the Certification of Health Care Provider dated February 22, 2006, Clayton did not provide any additional information from her health-care provider to Pioneer Bank regarding the expected duration of her impairment.  See Aug. 25 Tr. at 149:20-23 (Smith).

30.     Pioneer Bank, its agents, and its employees, never sought or received any additional information from Dr. Vega regarding the expected duration of Clayton's incapacity because of her

medical condition.  See Aug. 25 Tr. at 18:7-11 (Clayton); id. at 158:7-11 (Smith).

31.    Clayton's FMLA leave expired on March 1, 2006.  See Aug. 25 Tr. at 38:21 (Clayton).

32.    Clayton applied for and, on March 1, 2006, began receiving, short-term disability-compensation benefits from Pioneer Bank.  See Aug. 25 Tr. at 14:17-18 (Clayton).

33.    Pioneer Bank's short-term disability policy was self-funded and awarded at Pioneer Bank's sole discretion.  See Plaintiff's Exhibits 1-9 and 1-10, Pioneer Bank Employee Manual Chapter III, Section 5.1, "Short-Term Disability."

34.    In March, 2006, Clayton was hospitalized for three to four days for a cardiac catheter procedure.  See Aug. 25 Tr. at 36:18-37:3 (Clayton).

35.    Clayton was scheduled to see her primary care physician in April 2006, and Clayton told her co-workers that she hoped she would be released to return to work at that doctor's appointment. See Aug. 26 Tr. at 24:1-6 (Escobar).

36.    Clayton's primary-care physician did not release her to return to work in April 2006, because Clayton continued to experience medical complications.  See Aug. 25 Tr. at 41:3-13, 42:5-8 (Clayton).

37.    Clayton's next appointment with her primary-care physician was scheduled for August 16, 2006.  See Aug. 25 Tr at 43:1-13 (Clayton).

38.    Clayton again anticipated that she would be released to return to work at the August 16, 2006 appointment.  See id.

39.    From the time of her heart attack through approximately April of 2006, the employees in Pioneer Bank's check-processing department had some difficulty keeping up with the work, despite Pioneer Bank's efforts to assign temporary or "floater" employees to assist in Clayton's

absence.  Aug. 26 Tr. at 9:22-10:13 (Davies).

40.     Clayton's continued absence put a strain on the Statement Processing Department, which was evidenced by the fact that the mailing of bank statements was falling behind.  See Aug. 26 Tr. at 9:20-10:2 (Davies).

41.     Sometime in April of 2006, Pioneer Bank temporarily reassigned one of its employees, Casey Booth, to the check processing department after Clayton was not released to work in April 2006.  See Aug. 26 Tr. at 10:20-11:6 (Davies);  id. at 39:24-40:14 (Booth).

42.     Booth worked at Clayton's desk.  See Aug. 26 Tr. at 12:14-13:12 (Davies).

43.     After April of 2006, all the employees in the check-processing department, along with the operations officer of the check-processing department, Georgia Davies, agreed that the work load was manageable.  See Aug. 26 Tr. at 15:1-8 (Davies).

44.     The employees in the check-processing department, along with Smith, testified, and the Court finds, that it would have been reasonable to continue with this arrangement through the end of August 2006, and that doing so would not have created any undue hardship for Pioneer Bank.  See Aug. 26 Tr. at 16:12-16 (Davies);  Aug. 25 Tr. at 81:13-19 (Armendariz);  Aug. 25 Tr. at 127:3-10, 157:22-158:6 (Smith).

45.     Pioneer Bank began reviewing Clayton's employment status in June 2006.  See Aug. 26 Tr. at 51:21-52:8 (Palmer).

46.     While Christopher Palmer, Senior Vice President, testified that, as of June 2, he did not have sufficient information to determine whether Clayton would return to work in August, the Court finds that the Certification of Health Provider, combined with Clayton's expressed intentions to return in August of 2006, constitute sufficient notice that she would be able to return in August, 2006 .  See Aug. 26 Tr. at 56:6-21 (Palmer); id. at 15:18-16:5 (Davies); Certificate of Health Provider

at 1.[3]

47.     Smith believed that Clayton intended to return in August of 2006.  <u>See</u> Aug. 25 Tr. at 123:2-7 (Smith).

48.     Smith told Palmer, on several occasions, about her conversations with Clayton and about her belief that she would return if possible.  <u>See</u> Aug. 25 Tr. at 123:2-11 (Smith).

49.     Smith told Palmer that she believed that Pioneer Bank should wait until the end of August to see if Clayton would return as anticipated.  <u>See</u> Aug. 25 Tr. at 129:18-24 (Smith).

50.     Smith believed that Clayton's request was reasonable and did not recall any specific complaints about Clayton's absence.  <u>See</u> Aug. 25 Tr. at 124:14-25; 159:18-25 (Smith).

51.     Palmer and Smith met with Pioneer Bank's legal counsel for employment matters, Stephen Bell, in late June 2006 to determine if Pioneer Bank had any obligation under New Mexico state law or federal law to continue Clayton's employment.  <u>See</u> Aug.26 Tr. at 57:13-25 (Palmer).

52.     Mr. Bell was then a lawyer with Atwood, Malone, Turner & Sabin, but was, at the time he testified at the trial, a state district judge in the Fifth Judicial District for Chavez, County, State of New Mexico.  <u>See</u> Aug. 26 Tr. at 71:8-72:9 (Bell, Patterson).

53.     Mr. Bell was not told about Smith's objections, about Smith's belief that Clayton intended to return to work in August, that Clayton was on short-term disability leave until that time, or that Smith believed it would be reasonable to wait until the end of August to allow Clayton the chance to return to work.  <u>See</u> Aug. 26 Tr. at 83:13-84:9 (Bell).

_____

[3] While it is true that the Certificate of Health Care Provider states, in one part, that Clayton's incapacity would last "6 months or more," the same Certificate also states that she would need "6 months off."  Certificate of Healthcare Provider at 1.  The reference to six-months is consistent, and it corresponds to Clayton's verbal communications to Pioneer Bank that she expected to return to work in August 2006.  The Court therefore believes that Pioneer Bank was on notice of how long Clayton needed to be absent from work.

54.     Mr. Bell advised Pioneer Bank that it had done more for Clayton than what state and federal law required, and that state and federal law did not prohibit the termination of Clayton's employment.  See Aug. 26 Tr. at 79:18-23 (Bell).

55.     On July 5, 2006, four weeks before Clayton's short-term disability leave was set to expire, and eight weeks before she was expected to return to work, Smith wrote that she spoke with Clayton "concerning her leave status" that day.  Plaintiff's Exhibit 7-1, Electronic mail from Laura Smith to Christopher Palmer (dated July 5, 2006).

56.     Mr. Bell said that the ADA was not really something he considered when he told Palmer he did not see anything wrong with firing Clayton in the summer of 2006.  See Aug. 26 Tr. at 84:18-22 (Bell).

57.     Clayton told Smith that Dr. Vega had not yet released her to work as of her April[4] visit, but that she was going to insist that her doctor release her to work on her next visit, scheduled for August 16, 2006.  See Plaintiff's Exhibit No. 7-1; Aug. 25 Tr. at 17:15-24 (Clayton); 122:2-8 (Smith).

58.     Smith advised Clayton that she could not return to work without a release from her physician.  See Aug. 25 Tr. at 42:13-18 (Clayton).

59.     Smith concluded that Clayton was requesting that she be allowed to continue on short-term disability leave until the end of August 2006.  See Aug. 25 Tr. at 159:11-19 (Smith).

60.     Clayton stayed in contact with her co-workers.  See Aug. 25 Tr. at 16:15-22 (Clayton).

61.     Clayton repeatedly told her co-workers that she expected to return in August 2006.

---

[4] Clayton had initial testified that she saw the doctor in May, but later clarified that she had mixed up the dates, and that the visit to which she was referring happened in April 2006.  See Aug. 25 Tr. at 42:23-24 (Clayton).

<u>See</u> Plaintiff's Exhibits Nos. 12-1, 12-2, 12-3, 12-4, Letters to Lillian Weinreb from co-workers Lili Armendariz, Cruz Escobar, Juana Gaytan, and Jane Earl;  Aug. 25 Tr. at 54:23-24 (Clayton);  Aug. 26 Tr. at 38:2-7 (Gaytan).

62.    Clayton also contacted her immediate supervisor, Davies.  <u>See</u> Aug. 26 Tr. at 9:1-8 (Davies).

63.    Clayton told Davies that she expected to return in August, 2006.  <u>See</u> Aug. 26 Tr. at 15:18-16:5 (Davies).

64.    Davies interpreted her interactions and conversations with Clayton as a request by Clayton to extend her leave until August, 2006.  <u>See</u> Aug. 26 Tr. at 15:18-16:5 (Davies).

65.    According to Smith, on July 17, 2006, Pioneer Bank elected to continue Clayton's employment and placed her on short-term disability leave.  <u>See</u> Aug. 25 Tr. at 122:13-20 (Smith).

66.    Pioneer Bank used the same criteria which its long-term disability insurance carrier used to determine if an employee was entitled to long-term disability.  <u>See</u> Plaintiff's Exhibit 1, Pioneer Bank Employee Manual, Chapter III, Section 5.1 at A-4-III-10-11 ("Long-Term Disability Insurance Benefit").

67.    Once Pioneer Bank awarded an employee the short-term disability benefit, it paid an employee sixty percent of the average basic earnings that the employee earned during the last three months of employment.  <u>See</u> Long-Term Disability Insurance Benefit at A-4-III-11.

68.    After Pioneer Bank placed Clayton on short-term disability leave, it continued to pay its portion of her health-insurance premium, which was a benefit awarded only to Pioneer Bank's employees.  <u>See</u> Aug. 25 Tr. at 58:22-24 (Clayton).

69.    Pioneer Bank paid Clayton's health insurance even after it terminated Clayton's employment.  <u>See</u> Aug. 25 Tr. at 58:22-24 (Clayton).

70.     Clayton's short-term disability was originally set to expire on July 31, 2006, but in the July, 2006 letter notifying Clayton of her termination, Pioneer Bank extended the date to August 31, 2006, which coincided with the six-month period of incapacity from work referenced in Dr. Vega's February 22, 2006, Physician's Certification.  See Plaintiff's Exhibit No. 8, Letter from Laura Smith to Shirley Clayton, dated July 21, 2006.  See Aug. 25 Tr. at 139:15-20 (Smith).

71.     From July 17, 2006, until her termination, Smith considered Clayton to be on leave. See Aug. 25 Tr. at 128:11-21 (Smith).

72.     Palmer told Smith that he did not believe that Clayton wanted to return to work.  See Aug. 25 Tr. at 123:2-124:6 (Smith).

73.     Palmer, who has no medical training or education, admitted he never received or sought any information from Clayton about her plans to return to work.  See Aug. 25 Tr. at 106:9-15 (Palmer).

74.     Palmer never sought any information from Dr. Vega.  See Aug. 26 Tr. at 64:19-65:5 (Palmer).

75.     Palmer did not look at any documents in Clayton's personnel file.  See Aug. 26 Tr. at 64:19-65:1 (Palmer).

76.     The last, best medical information that Pioneer Bank had as to when Clayton would be released to return to work was the February 22, 2006, Physician's Certificate from Dr. Vega, which he had not seen when he decided to terminate Clayton.  See Aug. 25 Tr. at 95:19-96:8 (Palmer);  Aug. 26 Tr at 60:9-12 (Palmer).

77.     There was no evidence to support Palmer's conclusion that Clayton did not want to return to work.

78.     Palmer, over Smith's objections, recommended that Pioneer Bank terminate Clayton

-12-

sometime in June or July of 2006.  See Aug. 26 Tr. at 63:7-11 (Palmer).

79.     Palmer, Smith, Mr. Bell, and Executive Vice President Steve Punch met to discuss Clayton's employment status, and the group accepted Palmer's recommendation to terminate Clayton.  See Aug. 26 Tr. at 58:9-59:22 (Palmer).

80.     As of July 21, 2006, Pioneer Bank did not know for certain the expected duration of Clayton's impairment, but the bank had documentation from Clayton's doctor suggesting she would be incapacitated until at least the middle of August.  See Aug. 26 Tr. at 56:6-21 (Palmer).

81.     On July 21, 2006, Pioneer Bank sent Clayton a letter advising her that she was terminated.  See Aug. 25 Tr. at 18:18-19 (Clayton).

82.     Throughout this litigation, Pioneer Bank has asserted that Clayton was not on leave during the time she was receiving short-term disability payments.  See Aug. 26 Tr. at 47:4-13 (Palmer).

83.     The Court finds that Clayton was on leave; in his affidavit of November 16, 2006, Palmer states that the bank "continued to hold Ms. Clayton's position open for her based upon her continuing representations that she would be released by her physician."  Palmer Affidavit ¶ 16, at 2.

84.     Palmer believed that heart-attack victims like Clayton could not recover sufficiently to return to work.  See Aug. 25 Tr. at 105:22-106:8 (Palmer).

85.     When questioned whether he had ever referred to the women in the check-processing department as the "geriatric ward," Palmer did not deny making such a statement, saying simply that he could not remember if he had.  See Aug. 25 Tr. at 109:16-110:14 (Palmer).  The Court nevertheless concludes that there is insufficient evidence that he did make such a statement.  The only other evidence offered at trial regarding Palmer's statement calling the bank processing department

a "geriatric ward" consisted of inadmissible hearsay.  See Aug. 25 Tr. at 133:18-20 (Court).  Given

the lack of admissible evidence regarding that statement, the Court cannot conclude that Palmer made

the statement.

86.     According to Smith, Clayton was the only employee Pioneer Bank ever terminated

to whom it had granted short-term disability leave before the leave expired.  See Aug. 25 Tr. at

122:21-24 (Smith).

87.     Clayton was sixty-three years old at the time that Pioneer Bank terminated her.

Clayton was the sole working provider for herself and her husband, who has cancer and is disabled.

See Aug. 25 Tr. at 28:12-20 (Clayton).

88.     Clayton was severely shocked and upset to learn she had been fired.  See Aug. 25 Tr.

at 19:2-3 (Clayton).

89.     Clayton's termination was extremely distressing to her.  See Aug. 25 Tr. at 127:21-24

(Smith).

90.     Clayton had planned on working another ten years.  See Aug. 25 Tr. at 28:9-11

(Clayton).

91.     Clayton saw her primary-care physician in July 2006, after being advised that her

employment would be terminated, and Clayton's primary-care physician did not release her to return

to work in any capacity at that time.  See Aug. 25 Tr. at 42:5-8 (Clayton).

92.     In late August of 2006, Dr. Vega released Clayton to return to limited work of up to

four hours per day.  See Aug. 25 Tr. at 19:17-24;  id. at 49:3-6 (Clayton).[5]

_____

[5] Clayton did not provide any testimony or evidence from her primary-care physician to
substantiate her statement that she was released to four hours of work per day in late August, 2006.
See Aug. 25 Tr. at 155:18-156:3 (Smith); id. at 50:22-25 and 51:11-13 (Clayton).

93.     Clayton did not inform Pioneer Bank, at any time, that she had been released to return to limited work of up to four hours per day in August 2006.  See Aug. 25 Tr. at 55:4-11 (Clayton).

94.     Clayton did not inform Pioneer Bank, at any time, that she had been released to return to all of the essential functions of her position.  See Aug. 25 Tr. at 36:11-16 (Clayton).

95.     Clayton did not ask for a modification of her working hours to four hours per day as an accommodation, because she was terminated before she knew that she needed such an accommodation.  See Aug. 25 Tr. at 50:22-25 (Clayton).

96.     There would have been nothing unreasonable in allowing Clayton to return to work under a modified schedule.  See Aug. 25 Tr. at 157:22-158:6 (Smith).

97.     Clayton exhausted all forms of leave available to her under Pioneer Bank's policies on August 31, 2006.  See Plaintiff's Exhibit 8, Letter from Laura Smith to Shirley Clayton (dated July 21, 2006).

98.     On September 1, 2006, Pioneer Bank's insurance carrier advised Pioneer Bank that Clayton was no longer disabled according to the definition of disability in Pioneer Bank's long-term disability policy.  See Plaintiff's Exhibit No. 9, Letter from Michelle R. Morgan, Benefit Specialist at Jefferson Pilot Financial Insurance Company to Laura Smith regarding Shirley Clayton (dated September 1, 2006).

99.     From this letter, Palmer inferred that Clayton's disability, which had prevented her from working up until that time, was no longer an issue.  See Aug. 26 Tr. at 65:11-25 (Palmer).

100.    For twenty-six weeks after her termination, Clayton sought and received unemployment compensation of $143.00 per week, or $3718.00.  See Aug. 25 Tr. at 59:11-19 (Clayton).

-15-

101.    To receive unemployment compensation, Clayton was required to submit at least two job applications per week, which she did.  See Aug. 25 Tr. at 20:1-2 (Clayton).

102.    Clayton applied for positions with local banks.  See Aug. 25 Tr. at 20:4-5 (Clayton).

103.    Clayton was not able to find any other employment.  See Aug. 25 Tr. at 22:2-4 (Clayton).

104.    Clayton did not apply for re-employment with Pioneer Bank.  See Aug. 25 Tr. at 160:1-15 (Smith).

105.    Clayton sought, but was not able to purchase health insurance or life insurance to replace the benefits she lost because she could not afford to do so.  See Aug. 25 Tr. at 22:12-20, 28:1-6 (Clayton).

106.    In March 2008, Clayton began receiving health insurance coverage under Medicare. See Aug. 25 Tr. at 22:13-14 (Clayton).

107.    Clayton had no health insurance between the time that her coverage from work terminated and March 2008.  See Aug. 25 Tr. at 22:13-14 (Clayton).

108.    Clayton incurred approximately $8000.00 in medical bills after her termination which would have been paid under her health-insurance policy.  See Aug. 25 Tr. at 22:24-23:1 (Clayton).

109.    Clayton alleges she pays an average of $150.00 per month for prescription drugs.  See Aug. 25 Tr. at 27:8-14 (Clayton).  Clayton did not, however, testify or provide evidence regarding what portion of her expenses for  prescriptions would have been covered under the health insurance she had as an employee at Pioneer Bank.  The Court is therefore unable to ascertain, by a preponderance of the evidence, the amount of damages attributable to prescription drugs.

110.    Clayton has spent all of the $4000.00 she saved in her 401k retirement plan for

household, medical, and living expenses.  See Aug. 25 Tr. at 27:20-25 (Clayton).

111.    Clayton worries about how she will pay the family expenses and make ends meet.  See Aug. 25 Tr. at 29:6-13 (Clayton).

112.    Clayton loses sleep wondering about what the future holds for her and her disabled husband.  See Aug. 25 Tr. at 29:3-13 (Clayton).

113.    From September of 2006 through August 2008, Clayton suffered the following economic losses:

    a.    Lost wages of $28,000.00, less $3,718.00 unemployment compensation, or $24,282.00.  See Compensation Record.

    b.    Lost vacation and holiday pay of $1,750.00 calculated from 2005 amounts: holiday pay of $358.22, vacation pay of $515.84. Total lost benefits equal approximately $875.00 per year.  See id.

    c.    Lost bonuses of $490.00 based on an annual bonus in 2005 of $245.38.  See id.

    d.    $8000.00 in medical expenses.

## CONCLUSIONS OF LAW

1.    The Court has jurisdiction over the parties and the subject matter of this litigation, which comprises Clayton's claims under the ADA and the NMHRA.  "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  Because the ADA is a United States statute, district courts exercise subject-matter jurisdiction over ADA claims. Federal district courts "have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that

they form part of the same case or controversy under Article III of the United States Constitution."

28 U.S.C. § 1367.  Clayton's NMHRA claim arises out of the same set of allegations as the ADA

claim.  Moreover, as the Court discussed in its Memorandum Opinion and Order:

> [T]he appellate process, which New Mexico's Legislature created in N.M.S.A. 1978,
> § 28-1-13 contemplates, by its express language, exclusive jurisdiction over appeals
> from the New Mexico Human Rights Commission in the state district courts.  The
> New Mexico Legislature cannot, however,  deprive the federal court of jurisdiction
> that Congress has given it.  See Ry. Co. v. Whitton's Adm'r, 80 U.S. 270 (1871).

Memorandum Opinion and Order at 52.  The Court also noted that it is efficient to try the ADA and

NMHRA claims together.  Thus, the Court has jurisdiction over Clayton's NMHRA claim. See

Negrete v. Maloof Distrib. L.L.C., 2006 WL 4061178 at *4 (noting that "[t]he decision to exercise

supplemental jurisdiction is within the Court's discretion.").  Venue over Clayton's claim is proper

in this Court because the events giving rise to Clayton's claims occurred in Roswell, which lies

within the District of New Mexico.

2.      The McDonnell-Douglas burden shifting analysis applies during the summary

judgment phase of a case, but not at trial.  See  Whittington v. Nordam Group Inc., 429 F.3d 986, 993

(10th Cir. 2005).  At trial, the plaintiff bears the burden of proving her discrimination claim, and the

"ultimate question" for the fact-finder becomes: "[W]hich party's explanation of the employer's

motivation it believes."   Whittington v. Nordam Group Inc., 429 F.3d at 993 (quoting U.S. Postal

Service Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983)); U.S. Postal Service Bd. of Governors

v. Aikens, 460 U.S. at 716 (explaining that "[t]he plaintiff retains the burden of persuasion" in

proving her discrimination claim).

3.      The United States Court of Appeals for the Tenth Circuit has explained:

The prima facie case method established in McDonnell Douglas was never intended

to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to
evaluate the evidence in light of common experience as it bears on the critical
question of discrimination. Where the defendant has done everything that would be
required of him if the plaintiff had properly made out a prima facie case, whether the
plaintiff really did so is no longer relevant. The district court has before it all the
evidence it needs to decide whether the defendant intentionally discriminated against
the plaintiff.

Whittington v. Nordam Group Inc., 429 F.3d at 993.

4.      Clayton demonstrated that she is disabled within the meaning of the ADA. The
duration of her medical condition from the time of her heart attack in November of 2005, through the
time of her termination in July of 2006, combined with the severity of her condition, establish that
Clayton was a "disabled person" under the ADA.  The ADA defines disability as (i) a physical or
mental impairment that substantially limits one or more of the major-life activities of such an
individual; (ii) a record of a physical or mental impairment that substantially limits one or more of
the major-life activities of such an individual; or (iii) being regarded as having a physical or mental
impairment that substantially limits one or more of the major-life activities of such an individual.
See McGeshick v. Principi, 357 F.3d 1146, 1150 (10th Cir. 2004);  42 U.S.C. § 12102(2).

5.      A substantial limitation means that a plaintiff is unable to perform a major life activity
– such as working – that an average person could perform, or that her performance is significantly
restricted in condition, manner, or duration as compared with an average person doing the same
activity.  See 29 C.F.R. § 1630.2(j).  When evaluating whether a limitation is "substantial," courts
consider: "(i) The nature and severity of the impairment; (ii) The duration or expected duration of
the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term
impact of or resulting from the impairment". 29 C.F.R. § 1630.2(j)(2). The severity, duration, and
long-term impact of Clayton's heart attack and subsequent recovery combined to create a substantial

limitation in her ability to work.

6.     A cardiovascular physiological disorder or condition, such as the one Clayton suffered, qualifies as a physical impairment.  See Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 194 (2002);  29 C.F.R. § 1630.2(h)(1).  For a disability to qualify for purposes of the ADA, "[t]he impairment's impact must also be permanent or long term."  Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. at 198.  See Velarde v. Associated Reg'l and Univ. Pathologists, 61 Fed.Appx. 627, 631 & n.3 (10th Cir. 2003)(holding that impairments lasting less than two months did not substantially limit the claimant's overall functioning); McKenzie v. Dovala, 242 F.3d 967, 973 (10th Cir. 2001)(stating that approximately four months of missed work would not "tend to support a finding of disability, inasmuch as [the plaintiff] has been released to return to work, [but] the evidence as a whole could lead a reasonable jury to conclude that she had a record of a disability for purposes of the ADA.").

7.     The Tenth Circuit noted in Aldrich v. Boeing Co., 146 F.3d 1265 (10th Cir. 1998), that:

> Although temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities . . . .  An impairment does not necessarily have to be permanent to rise to the level of a disability. Some conditions may be long-term, or potentially long-term, in that their duration is indefinite and unknowable or is expected to be at least several months. Such conditions, if severe, may constitute disabilities.

146 F.3d at 1270 (internal quotation marks omitted).

8.     Clayton has a cardiovascular disorder that substantially limited her ability perform a major life activity, i.e. working.  See Certificate of Health Care Provider at 1-2.  After her heart attack and her surgery, Clayton's physician placed her under medical restrictions that prevented her from

working.  See Aug. 25 Tr. at 13:18-14:1 (Clayton).  In February, 2006, Dr. Vega certified that Clayton was incapacitated, and that she would be unable to work or carry out other daily activities for at least six months.  See Certificate of Health Care Provider at 2.  Thus, while Clayton's incapacity was not permanent, the Court believes it was of a sufficiently long duration to qualify as a disability, given that Clayton was unable to work for nine months.  See Certification of Health Care Provider at 2.

9.      While the Tenth Circuit has held that impairments lasting two and four months are too temporary to constitute disabilities, see Velarde v. Associated Reg'l and Univ. Pathologists, 61 Fed.Appx. at 631 & n.3;  McKenzie v. Dovala, 242 F.3d at  973, the Tenth Circuit has also recognized that a plaintiff was disabled under the ADA when she was impaired for less than a year, see McKenzie v. Dovala, 242 F.3d at 968.  In McKenzie v. Dovala, the plaintiff's period of incapacity ran from "early" 1996 to November of that same year.  See id.  Although the Tenth Circuit did not provide an exact time-frame, the relevant time period in McKenzie v. Dovala could not have been much more than the nine-month period that constituted Clayton's inability to work.

10.      Clayton's  doctor provided documentation that she was "unable to work" and "incapacitated" from November 2005 until August of 2006.  See Certification of Health Care Provider at 1, 4 (noting that the condition "commenced" in November 2005 and would continue six-months beyond February 22, 2006 – the date on the Certificate of Health Care Provider).  Major life activities include such functions as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, sleeping, sitting, standing, lifting, reaching, and working.  See Poindexter v. Atchison, Topeka and Santa Fe Ry. Co., 168 F.3d 1228, 1231 (10th Cir. 1999); 29 C.F.R. § 1630.2(i).  Working has been recognized as a major life activity. See MacKenzie v. City and County of Denver, 414 F.3d at 1275.

-21-

11.     If the plaintiff's disability relates to the major-life activity of work, the plaintiff must

demonstrate that she is

> significantly restricted in the ability to perform either a class of jobs or a broad range
> of jobs in various classes as compared to the average person having comparable
> training, skills and abilities.  The inability to perform a single, particular job does not
> constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(i).  In this case, Clayton's doctor explicitly wrote that she needed six

months "off" when responding to a question regarding the employee's ability to work as a result of

her condition, further describing her as "incapacitated."  Certification of Health Care Provider at 1.

Dr. Vega further indicated that Clayton was "unable to work" and needed "to be absent from work."

Id. at 2.

12.     The Court therefore concludes that Clayton suffered a physical impairment that

constituted a substantial limitation on a major life activity, i.e., her ability to work.  Consequently,

she was disabled, as that term is understood, under the ADA.

13.     Clayton was qualified, with a reasonable accommodation, to perform the essential

functions of her job.  The parties do not dispute that physical attendance at Pioneer Bank's statement

processing office was an essential function of Clayton's position.  In deciding if a person can perform

the essential functions of a job with or without a reasonable accommodation, the court must first

determine "whether the individual can perform the essential functions of the job."  Mason v. Avaya

Communications, Inc., 357 F.3d 1114, 1118 (10th Cir. 2004).  The federal courts will defer to an

employer's judgment as to what functions of a job are essential.  See id. at 1119 (stating that a court

"will not second guess the employer's judgment when its description is job-related, uniformly

enforced, and consistent with business necessity.").

> The plaintiff bears the burden of showing she is able to perform the essential functions of her job. US Airways, Inc. v. Barnett, 535 U.S. 391 (2002). "Essential functions" are "the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). Evidence considered in determining whether a particular function is essential includes: (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; and (5) the work experience of past incumbents in the job. 29 C.F.R. § 1630.2(n)(3); see also Wells v. Shalala, 228 F.3d 1137, 1144 (10th Cir. 2000).

Mason v. Avaya Communications, Inc., 357 F.3d at 1119.

14.     At the time Clayton was terminated, she could not perform all of the essential functions of her job.  The essential functions of Clayton's job included: standing; walking; sitting; using hands and fingers; handling objects, tools, or controls; reaching with hands and arms; climbing stairs; balancing; stooping; kneeling; talking and hearing; and occasionally lifting up to fifteen pounds.  All of these functions were performed at Pioneer Bank and could not be done from another location.  Physical attendance in the workplace was therefore an essential function of Clayton's position.  See Aug. 25 Tr. at 35:5-36:4 (Clayton).

15.     Because Clayton could not perform the essential functions of her position, the Court must determine whether any reasonable accommodation by Pioneer Bank would have enabled Clayton to perform those functions.  Brockman v. Wyoming Dept. Of Family Services, 342 F.3d at 1122.

16.     The ADA lists some reasonable accommodations that may be required of an employer.  Reasonable accommodations "may include . . . (B) job restructuring, part-time or modified work schedules . . . and other similar accommodations for individuals with disabilities."  42 U.S.C. § 12111(9).  See Smith v. Midland Brake, Inc., 180 F.3d 1154, 1161 (10th Cir. 1999).  "An allowance

of time for medical care or treatment may constitute a reasonable accommodation." Taylor v.
Pepsi-Cola Co., 196 F.3d 1106, 1110 (10th Cir. 1999).

      17.    Job restructuring such as a modified or part-time schedule is considered a reasonable
accommodation. 42 U.S.C. § 12111(9)(B); 29 C.F.R. § 1630.2(o)(2). In Taylor v. Pepsi-Cola Co.,
the Tenth Circuit found that "an indefinite period of medical leave [wa]s not a reasonable
accommodation" because the

> [p]laintiff failed to present evidence of the expected duration of his impairment. At
> the time Defendant terminated him, Plaintiff had already been on leave for medical
> treatment for more than one year. Plaintiff's doctor did not release him to return to
> work, subject to substantial restrictions, until June 2, 1997. Plaintiff would have
> required ten and one-half months combined with and following a one year medical
> leave. Such an accommodation is not reasonable, particularly when Plaintiff had
> already advised Defendants he would never be able to return to his former position
> and could not advise when and under what conditions he could return to any work.

196 F.3d at 1110.

      18.    In Hudson v. MCI Telecommunications Corp., 87 F.3d 1167 (10th Cir. 1999), the
Tenth Circuit held that the plaintiff "failed to present a genuine issue of material fact for trial." Id.
at 1169. The Tenth Circuit stated that "a reasonable allowance of time for medical care and treatment
may, in appropriate circumstances, constitute a reasonable accommodation," but that the plaintiff
failed "to present any evidence of the expected duration of her impairment as of the date of her
termination." Id. The Tenth Circuit explained:

> The physicians' reports upon which plaintiff relies indicate only that permanent
> impairment was not anticipated at the time the reports were prepared. The forms
> provide no indication, however, of when plaintiff could expect to resume her regular
> duties at [her employer]. Moreover, [her doctor's] notes through the date of her
> termination underscore the uncertainty of her prognosis. Under these circumstances,
> it makes no difference that [her employer] had the option of removing her from the
> payroll and paying the cost of her disability benefits. [Her employer] was not required
> to wait indefinitely for her recovery, whether it maintained her on its payroll or

elected to pay the cost of her disability benefits. Accordingly, [the plaintiff] has failed to present evidence from which a reasonable jury could find that the accommodation she urges, unpaid leave of indefinite duration, was reasonable.

Id.

19.    "An employer is not required to wait indefinitely for an employee to recover." Brockman v. Wyoming Department of Family Services, 342 F.3d 1159, 1168 (10th Cir. 2003). When the plaintiff did not have any evidence that she told her employer she could return to work, the court held that summary judgment for the employer was properly granted. Id. "An employee with a disability who is granted leave as a reasonable accommodation is entitled to return to his/her same position unless the employer demonstrates that holding open the position would impose an undue hardship." Equal Employment Opportunity Commission, Revised Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the ADA ¶ 18 (updated Oct. 2002), available at http://www.eeoc.gov/policy/docs/accommodation.html#N_125_ (citing Schmidt v. Safeway Inc., 864 F. Supp. 991, 996-97 (D. Or. 1994)).

20.    Nevertheless, Clayton's regular communication with the human resources director at Pioneer Bank sufficed as a request for leave until she obtained a medical release to work. She informed many employees at the bank that she was planning to return to work in August of 2006. See, e.g., Hendricks-Robinson v. Excel Corp., 154 F.3d 685, 694 (7th Cir. 1998) ("A request as straightforward as asking for continued employment is a sufficient request for accommodation"); Bultemeyer v. Ft. Wayne Community Schs., 100 F.3d 1281, 1285 (7th Cir. 1996) (stating that an employee with a known psychiatric disability requested reasonable accommodation by stating that he could not do a particular job and by submitting a note from his psychiatrist); Schmidt v. Safeway Inc., 864 F. Supp. at 997 ("[S]tatute does not require the plaintiff to speak any magic words. . . . The

employee need not mention the ADA or even the term 'accommodation.'"); <u>McGinnis v. Wonder Chemical Co.</u>, 5 AD Cas. (BNA) 219 (E.D. Pa. 1995)(explaining that employer on notice that accommodation had been requested because: (i) employee told supervisor that his pain prevented him from working and (ii) employee had requested leave under the FMLA).

21.     Smith was aware of Clayton's anticipated return after her next doctor's appointment on August 16, 2006, and fully expected Clayton to return at that time. <u>See</u> Aug. 25 Tr. at 122:2-124:4 (Smith). Clayton provided Pioneer Bank with an expected duration of her impairment before the termination of her employment. <u>See</u> Certification of Health Care Provider at 1 (stating that Clayton required "6 months off")(Dr. Vega).  That Clayton was able to provide documentation from a medical professional with an anticipated date of return suggests that she had been sufficiently clear in communicating her desire to receive time off to undergo her treatment and to receive a medical release to return to work when such a release would be appropriate.  She therefore asked for a reasonable accommodation.

22.     Clayton's situation is similar to that of the plaintiff in <u>Rascon v. U.S. West Communications, Inc.</u>, 143 F.3d 1324 (10th Cir. 1998) <u>abrogated on other grounds</u> by <u>Cisneros v. Wilson</u>, 226 F.3d 1113 (10th Cir. 2000), who informed his employer that he needed four months of leave for treatment and was able to complete treatment in slightly less than five months.  <u>See</u> 143 F.3d at 1328-29.  In <u>Rascon v. U.S. West Communications, Inc.</u> case, the request for additional leave was a reasonable accommodation. <u>See id.</u> at 1333-34. Other cases have held that indefinite unpaid leave is not a reasonable accommodation when a plaintiff cannot demonstrate the expected duration of the impairment.  <u>See</u> <u>Taylor v. Pepsi-Cola Co.</u>, 196 F.3d at 1110 (stating that requested accommodation was no reasonable where the plaintiff told his employer he may never be able to

return to his former job and where the doctor finally released him to work with restrictions ten and one-half months after termination); Hudson v. MCI Telecommunications Corp., 87 F.3d 1167, 1169 (10th Cir. 1996) (holding that unpaid leave was not a reasonable accommodation when the plaintiff did not present any evidence of expected duration of impairment or prognosis).  Clayton repeatedly informed Pioneer Bank of her intention to return to work at the end of her disability period, as suggested by her doctor,  and she was released to work again on September 1, 2008, ten days after her disability period would have expired.  The time that elapsed between her termination of July 21, 2008, and her release to return to work was six weeks.

23.    The Court notes that there is evidence in the record that, initially in August 2006, Clayton was released to work only four-hour days.  The Court does not believe that this evidence undermines Clayton's discrimination claim.   First, the discriminatory action – Pioneer Bank terminating Clayton's employment – occurred before Clayton received the four-hour-per-day release. Second, while the initial four-hour limitation has relevance whether there was too much uncertainty regarding whether Clayton would ever return to work, Clayton's evidence, taken as a whole, establishes that Clayton expected to receive a medical release to work, and in fact received such a release to work in August, consistent with what she represented to Pioneer Bank verbally and through the documentation she provided from Dr. Vega.  After her termination, Clayton actively sought work, submitting at least two job applications, as she was required to do to qualify for unemployment compensation. See Aug. 25 Tr. at 20:1-2 (Clayton).  Moreover, Smith testified that it would not have been unreasonable to further accommodate Clayton by allowing her to work four-hour days, as opposed to the thirty-two hours per week she worked before her heart attack.  See Aug. 25 Tr. at 157:22-158:6 (Smith).

24.     There is insufficient evidence to support Pioneer Bank's contention that the accommodation requested would have imposed an undue hardship on Pioneer Bank or its other employees.  The Court concludes, as noted in its Memorandum Opinion and Order at 1,  that Pioneer Bank did not experience undue hardship because of Clayton's eight-month absence.  See Aug. 26 Tr. at 16:12-16 (Davies).

25.     Specifically, Pioneer Bank did not experience any undue burden from Clayton's absence because Booth was available and willing to temporarily  substitute for Clayton to keep her department from getting behind.   All the employees within the check-processing department, including the department supervisor, Davies, felt that Booth could have stayed on in Clayton's position until she could come back.  Booth also considered the position a temporary assignment until the time he learned that Clayton was terminated.  See Aug. 26 Tr. at 40:3-18 (Booth).

26.     An employee states a cause of action for disability discrimination when the employer based its decision on factors related to a disability.  Bones v. Honeywell Int'l, Inc., 366 F.3d 869, 878 (10th Cir. 2004).  Clayton's disability was the determinative factor in Pioneer Bank's decision to terminate her.

27.     Before her illness, Clayton was considered a model employee and received excellent evaluations.  After her heart attack, she communicated with Pioneer Bank regularly and filled out all necessary paperwork to receive various leave benefits.  Pioneer Bank's insurance company approved her for short-term disability leave March 1, 2006 that would have covered her until August 1, 2006. With only days left to go under this coverage, Pioneer Bank terminated Clayton on July 21, 2006. Palmer admitted that he thought people who had heart attacks such as Clayton's would never return to work.  See Aug. 25 Tr. at 105:22-106:8 (Palmer).  Taken together, the preponderance of the

evidence establishes that Clayton was fired because of her disability and because of Pioneer Bank's belief that someone with her disability would not return to work.

28.     Thus, Clayton has established that she was disabled, that she was qualified to perform the essential functions of her job with a reasonable accommodation, and that she was terminated because of her disability.

29.      Pioneer Bank articulated a legitimate, non-discriminatory reason for terminating Clayton, i.e., that she was not at work performing her job duties.  See Palmer Affidavit ¶ 23, at 3.[6] Pioneer Bank asserts that it followed its standard company policies and practices with regard to the payment of short-term disability compensation benefits to Clayton.

30.     Nevertheless, the Court concludes that Pioneer Bank's reason for terminating Clayton was pretextual for the following reasons:

(i)     The timing of the termination, which occurred two weeks after Smith relayed Clayton's final request for an accommodation to Palmer, indicates an intent to terminate Clayton based on her disability.  See Termination Letter at 1.

(ii)    Pioneer Bank had placed Clayton on short-term disability leave and then terminated her before her leave period was allowed to expire.   See id.

(iii)   Pioneer Bank was leaving her position open based upon Clayton's representations that she was going to be released by her doctor, and that she was requesting a release to work.  See Palmer Affidavit ¶ 16, at 2.

(iv)    Palmer's reason for not accommodating Clayton's request was his personal belief,

---

        [6] The Palmer Affidavit lists two consecutive paragraphs numbered as 23.  The Court refers to the first paragraph number 23.

formed without adequate factual basis, that Clayton would not be able to work because she had a heart attack.  See Aug. 25 Tr. at 105:22-106:8 (Palmer).

31.     Thus, Clayton has proved her discrimination claim under the ADA.

32.     Clayton also established a claim under the NMHRA.  "The NMHRA prohibits employers from refusing to reasonably accommodate an individual's disability." Albert v. Smith's Food & Drug Centers, Inc., 356 F.3d 1242, 1254 (10th Cir. 2004) (citing NMSA 1976 § 28-1-7(J) (2000)).  The Tenth Circuit discussed the relationship between the ADA and the NMHRA, concluding that it is "appropriate to rely upon federal civil rights adjudication for guidance in analyzing a claim under the Act" as long as it is clear that the federal law does not become New Mexico law; the analysis must look to the state law and the state legislature's intent.  Albert v. Smith's Food & Drug Centers, Inc., 356 F.3d at 1255.

33.     The NMHRA tracks the federal Civil Rights Act of 1964, 42 U.S.C. § 2000e-2.  See Smith v. FDC Corp., 109 N.M. 514, 517, 787 P.2d 433, 436 (1990).  Under the NMHRA, it is unlawful discriminatory practice for:

> an employer, unless based on a bona fide occupational qualification or other statutory prohibition, to refuse to hire, to discharge, to promote or demote or to discriminate in matters of compensation, terms, conditions or privileges of employment against any person otherwise qualified because of race, age, religion color, national origin, ancestry, sex, physical or mental handicap or serious medical condition . . . .

N.M.S.A. 1978, § 28-1-7A.  Additionally, it is unlawful discrimination for "any employer to refuse or fail to accommodate to an individual's physical or mental handicap or serious medical condition, unless such accommodation is unreasonable or an undue hardship." Id. § 28-1-7J.

34.     Clayton demonstrated that she had a "serious medical condition" following her heart attack.  The Supreme Court of New Mexico has suggested that the terms "medical condition," under

the NMHRA, and "disability," under the ADA, may be interchangeable in some cases.  Trujillo v. Northern Rio Arriba Elec. Co-op, Inc., 131 N.M. 607, 612, 41 P.3d 333, 338 (2001)("Although the New Mexico statute uses the terms 'medical condition' or 'handicap' rather than the ADA term 'disability,' we believe in the context of this case that the terms can be viewed as interchangeable."). In Trujillo v. Northern Rio Arriba Elec. Co-op, Inc., the Supreme Court of New Mexico cited various federal decisions from multiple circuits in concluding that, similar to the ADA, the NMHRA does not encompass "temporary illnesses with minimal residual effects."   131 N.M. at 612, 41 P.3d at 338.

35.     Thus, a plaintiff who suffered a condition that lasted a few days, and for which no clear diagnosis was provided at the time of his termination, was not able to prove that he suffered from a "medical condition" under the NMHRA.   Trujillo v. Northern Rio Arriba Elec. Co-op, Inc., 131 N.M. at 613, 41 P.3d at 3389.  The Supreme Court of New Mexico noted that the plaintiff's problems

> existed for a short period; by March 13 [roughly a month after the illness in question] he had been cleared to return to work by his doctor. In a letter dated March 31, 1995, this doctor stated that although her initial diagnosis of his illness was a transient ischemic attack-like syndrome, the diagnostic testing revealed that Mr. Trujillo had not suffered a stroke and was, in fact, at low risk of stroke.

Id. at 613, 41 P.3d at 3389.

36.     In contrast to the situation in Trujillo v. Northern Rio Arriba Elec. Co-op, Inc., Clayton's condition was diagnosed, and she was undergoing treatment, including surgery.  Her heart attack necessitated triple-bypass surgery in December of 2005 and put her in the hospital for two weeks to recuperate.  See Aug. 25 Tr. at 12:25-13:6, 36:6-8 (Clayton).  She then went to physical therapy for another two weeks to regain functioning.  Pioneer Bank placed Clayton on FMLA leave

for twelve weeks.  Two months post-surgery, Clayton's doctor certified that she was "incapacitated" for at least six more months.  After her FMLA leave, Pioneer Bank granted Clayton short-term disability benefits or leave from March through August 2006.  Thus, Clayton was not suffering from a "temporary illnesses with minimal residual effects," but rather from a serious medical condition.

37.     Clayton showed that she was qualified to perform all the essential functions of her job if not for her medical condition, and that Pioneer Bank failed to accommodate her.  An employee has the initial duty of informing her employer of a disability "'before liability may be triggered for failure to provide accommodations.'"  Trujillo v. Northern Rio Arriba Elec. Co-op, Inc., 131 N.M. at 614, 41 P.3d at 340 (quoting Smith v. Midland Brake, Inc., 180 F.3d 1154, 1172 n. 10 (10th Cir. 1999), which in turn was quoting Beck v. University of Wisconsin Board of Regents, 75 F.3d 1130, 1134 (7th Cir. 1996)).  Clayton fulfilled that initial duty by remaining in contact with Pioneer Bank, and by providing certification regarding the nature and extent of her illness and regarding her incapacity to work for at least six months.

38.     Clayton's heart attack caused her doctor to place her under work restrictions during her recovery period.  Once Clayton went to her August 2006 medical appointment, her doctor released her to work half-days as she gained sufficient strength to resume a full-time schedule. Pioneer Bank terminated her employment shortly before this August 2006 medical appointment based on her temporary inability to work.  Pioneer Bank did not offer Clayton leave until the end of her recovery period as forecasted by Dr. Vega, which would have been a reasonable accommodation in this case.

39.     The Court concludes that, under the NMHRA, Clayton suffered from a "serious medical condition," that Pioneer Bank failed to accommodate her, and that she has thus proven her

NMHRA claim.

40.	Given that Clayton has established her claims under the ADA and the NMHRA, she is entitled to damages. A complaining party who brings an action under the ADA for failure to provide a reasonable accommodation, or for unlawful discrimination in employment, may recover compensatory and punitive damages as authorized by Sections 2000e-4, 2000e-5, 2000e-6, 2000e-8, and 2000e-9.  See 42 U.S.C. § 12117(a).

> If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate.

42 U.S.C. § 2000e-5(g).

41.	Requested relief may include such relief as a court deems "necessary to insure the full enjoyment of the rights herein described." 42 U.S.C. § 20003-6(a).  Section 2000e-7 explicitly states that nothing in the United States Code chapter relieves an employer of liability for an unlawful employment practice that would be available under a state law.  See 42 U.S.C. § 2000e-7.

42.	Punitive damages may be recovered if the complaining party shows that the defendant discriminated against her with malice or reckless indifference.  See 42 U.S.C. § 1981a(b)(1).  In this case, there is insufficient evidence in the record of malice or reckless indifference on the part of Pioneer Bank to establish entitlement to punitive damages.  Punitive damages are therefore not recoverable.

43.	Reinstatement is the preferred remedy for ADA violations; however, when

reinstatement is not appropriate, front pay may be awarded instead.  See Fitzgerald v. Sirloin Stockade, Inc., 624 F.2d 945, 956-57 (10th Cir. 1980).

> [I]n an employment discrimination case, once discriminatory activity has been proved, courts are willing to award damages despite uncertainty and the lack of precise measurement of injury as long as there is some evidence of damage, because of the public policy inherent in the law condemning invidious discrimination. See Hairston v. McLean Trucking Co., 520 F.2d 226, 232-33 (4th Cir. 1975); United States v. United States Steel Corp., 520 F.2d 1043, 1050 (5th Cir. 1975), cert. denied, 429 U.S. 817, 97 S.Ct. 61, 50 L.Ed.2d 77 (1976); Pettway v. American Cast Iron Pipe Co., 494 F.2d 211, 260-61 (5th Cir. 1974).

Smith v. FDC Corp., 109 N.M. at 520, 787 P.2d at 439.  "Once discrimination has been proved, the employer bears the burden of uncertainty in damage calculation."  Id. at 521, 787 P.2d at 440.

44.    "It is well-established that remedies under Title VII constitute equitable awards which are intended to advance the dual statutory goals of 1) eliminating the effects of past discrimination and 2) preventing future discrimination." Albemarle Paper Co. v. Moody, 422 U.S. 405, 418 (1975). While the remedies available under the statute are intended "to make persons whole for injuries suffered on account of . . . discrimination" Albemarle Paper Co. v. Moody, 422 U.S. at 418, the statute also contains a punitive component to be directed against the discriminating entity, allowing the court to employ whatever remedies are necessary to achieve the public policy interests at issue, see Franks v. Bowman Transp. Co., 424 U.S. 747, 762-68 (1976).

45.    In fashioning a remedy, it is the duty of the Court to fashion "the most complete relief possible." Albemarle Paper Co. v. Moody, 422 U.S. at 421.  Medina v. Harvey, 423 F.Supp.2d 1227, 1229 (D.N.M. 2006).

46.    "The district court is vested with considerable discretion in formulating remedies for Title VII violations.  However, the exercise of this discretion must be guided by the fact that "one

-34-

of the central purposes of Title VII is 'to make persons whole for injuries suffered on account of unlawful employment discrimination.'" Carter v. Sedgwick County, Kan., 36 F.3d 952, 957 (10th Cir. 1992) (internal citations omitted).  Because the purpose of an award is to make each plaintiff whole, the court must examine the individual circumstances in making a decision.  See Davoll v. Webb, 194 F.3d 1116, 1145 (10th Cir. 1999).

47.     The Tenth Circuit in Davoll v. Webb adopted the practice of the United States Court of Appeals for the Sixth Circuit of listing "numerous factors" to consider when calculating front pay awards.   These factors include: (i)  work-life expectancy; (ii)  salary and benefits at time of termination; (iii)  any potential increase in salary through regular promotions and cost of living adjustment; (iv) the reasonable availability of other work opportunities; (v) the period within which a plaintiff may become re-employed with reasonable efforts; and (vi) methods to discount any award to net present value.  See Davoll v. Webb, 194 F.3d at 1144 (citing Shore v. Federal Express Corp., 777 F.2d 1155, 1160 (6th Cir. 1985)).

48.     The NMHRA follows a similar approach to deciding and awarding damages. See Sonntag v. Shaw, 130 N.M. 238, 249, 22 P.3d 1188, 1199 (2001)(upholding a damage award that was calculated by "adding the cumulative salary discrepancy for the years 1993 through 1995 . . . to the seven percent difference between the stock that [the plaintiff] and the male managers received . . . plus ten percent interest on the stock she should have received. . . ."); Smith v. FDC Corp, 109 N.M. at 521, 787 P.2d at 440 (explaining that, "in an employment discrimination case, once discriminatory activity has been proved, courts are willing to award damages despite uncertainty and the lack of precise measurement of injury as long as there is some evidence of damage, because of the public policy inherent in the law condemning invidious discrimination").

49.     New Mexico also recognizes that front pay may be an appropriate remedy in some

cases.  <u>See</u> <u>Smith v. FDC Corp</u>, 109 N.M. at 521, 787 P.2d at 440.

50.     The Supreme Court of New Mexico has explained that the evidentiary burden in an

NMHRA case is on the employer to show that the plaintiff's evidence is inappropriate.   <u>See</u> <u>Smith</u>

<u>v. FDC Corp</u>, 109 N.M. at 521, 787 P.2d at 440.  In <u>Smith v. FDC Corp</u>, the plaintiff provided

evidence of his hourly wage at the time he began working, but did not provide any pay stubs or other

evidence of his pay rate at the time of his termination.  Even though the Supreme Court of New

Mexico noted that this information may have left "uncertainty," the Supreme Court of New Mexico

held that the evidence sufficed as a basis for calculating lost earnings.  <u>See</u> <u>id.</u> at 521-22, 787 P.2d

at 440-41 ("[I]n an employment discrimination case, once discriminatory activity has been proved,

courts are willing to award damages despite uncertainty and the lack of precise measurement of

injury as long as there is some evidence of damage, because of the public policy inherent in the law

condemning invidious discrimination.").

51.     "Reasonable attorney's fees may be awarded at the court's discretion to a prevailing

complainant pursuant to NMSA 1978, Section 28-1-13(D)."  <u>Smith v. FDC Corp.</u>, 109 N.M. at 522,

787 P.2d at 441.  To determine whether attorney fees are reasonable, courts should consider (i) the

time and effort required, considering the complexity of the issues and the skill required; (ii) the

customary fee in the area for similar services; (iii) the results obtained and the amount of the

controversy; (iv) time limitations; and (v) the ability, experience, and reputation of the attorney

performing the services.  <u>See</u> <u>id.</u>  Clayton, as the prevailing plaintiff, has the right to recover actual

damages, reasonable attorney fees, and costs under the NMHRA.  <u>See</u> NMSA 1978, § 28-1-13(D).

52.     Shirley Clayton was sixty-three years old at the time of her termination in 2006.  She

turned sixty-five in March of 2008.  See Aug. 25 Tr. at 22:13 (Clayton).  Full social security

retirement for individuals born in 1943 is available at the age of 66, which for Clayton will be March

13, 2009.  See "Retirement Planner" at www.ssa.gov.  Clayton applied for social security benefits

beginning at age 62, and could have continued to earn $12,000 annually in regular income while still

drawing this benefit.  See Aug. 25 Tr. at 10:3-8 (Clayton).  "Public assistance and social security

constitute benefits from a collateral source, and they are not subject to offset from an award of

damages.  Public sources that provide subsistence income do not constitute a windfall such that they

should be offset against a damage award, especially when considered in light of . . . discriminatory

activities . . . ."  Smith v. FDC Corp., 109 N.M. at 521, 787 P.2d at 440.

        53.     In light of the evidence presented at trial, because Clayton was close to retirement age

at the time of her termination, because she unsuccessfully sought comparable employment, and

because it was unlikely that another employer would hire her at that point, the Court finds it

appropriate to order the following damages, which include compensation for the income lost during

the last three years of Clayton's expected work life:

        (i)     $29,750 for back pay and lost benefits to date. This number includes compensation at

$14,000.00 per year from September of 2006 through trial at the end of August 2008 (two years)

valued at $28,000.00.  Clayton's lost benefits are calculated at the value received in the last year of

employment, 2005, at $875.00 per year, totaling $1,750.00.

        (ii)    Front pay, lost benefits, and pay to be lost in the future up until the date at which she

would be eligible for full retirement.  September of 2008 to March of 2009 – full retirement age –

constitutes approximately six additional months. Therefore an additional $7,560.00 for one half-

year's worth of wages, benefits, and bonus pay would be appropriate in this case.

(iii)     Damages for emotional distress as allowed by 42 U.S.C. § 1981a(b)(3).  The Court believes that Clayton's testimony that she loses sleep, that she worries about her husband's and her future, and that her termination was extremely distressing is credible, and that the testimony is sufficient to support an award for emotional distress damages.  "A victim of discrimination who claims emotional harm need not present evidence that he received professional counseling." EEOC v. BCI Coca-Cola Bottling Co., 2008 WL 957892 at 1719 (D.N.M.)(Browning, J.) (citing Smith v. Northwest Fin. Acceptance, Inc., 129 F.3d 1408, 1417 75 FEP Cases 1274 (10th Cir. 1997)).  The Court accordingly orders $4000.00 in emotional distress damages, which it considers to be fair to Clayton, and at the same time, not excessive.

(iv) Damages for medical expenses in the amount of $8,000.00.

54.     In accordance with the local rules and the Federal Rules of Civil Procedure, Clayton's counsel may submit his costs and  request for attorney's fees.

**IT IS ORDERED** that Defendant Pioneer Bank pay damages to Plaintiff Shirley Clayton in the amount of $49,310.00, which includes $29,750 for back pay and lost benefits to date,  $7,560.00 for front pay and lost benefits, emotional distress damages of $4000.00, and medical expenses in the amount of $ 8,000.00.  Clayton may, pursuant to the local rules and the Federal Rules of Civil Procedure, submit her request for costs and fees.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

James P. Lyle
The Law Offices of James P. Lyle, P.C.
Albuquerque, New Mexico

>  *Attorneys for the Plaintiff*

Barbara Ann Patterson
Pittman Law Firm, P.C.
Roswell, New Mexico

>  *Attorneys for the Defendant*